WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Zane Dickinson,

          Petitioner,

v.

David Shinn[1], et al.,

          Respondents.

No. CV-18-08037-PCT-MTL

**ORDER**

Pending before the Court is Magistrate Judge Deborah M. Fine's Report and Recommendation ("R & R") (Doc. 22), recommending that the Petition for Writ of Habeas Corpus (Doc. 1) be granted as to Ground II. Respondents filed Objections to the R & R (Doc. 25), and Petitioner filed a Response (Doc. 31). After considering the Petition (Doc. 1), Respondents' Limited Answer to the Petition (Doc. 6), Respondents' Supplemental Answer to the Petition[2] (Doc. 16), Petitioner's Reply to Respondents' Supplemental Answer (Doc. 21), the R & R (Doc. 22), the arguments raised in Respondents' Objection to the R & R (Doc. 25), and Petitioner's Response to Respondents' Objection (Doc. 31), the Court will reject the R & R's recommendation that this Court grant the Petition.

---

[1] David Shinn, Director of the Arizona Department of Corrections, is substituted for Charles L. Ryan, former Director of the Arizona Department of Corrections, pursuant to Fed. R. Civ. P. 25(d).

[2] After considering the Petition and Respondents' Limited Answer, the Magistrate Judge ordered supplemental briefing on the merits of Petitioner's ineffective assistance of trial counsel claim. (Doc. 10.)

# I.  Background

The Arizona Court of Appeals summarized the facts of this case in a published opinion as follows:

> For years, [Petitioner] and C.H., the victim, had been friends. In June 2011, they had a falling out when [Petitioner] failed to perform yard work he had agreed to do and refused to return tools to the victim. The two argued and [Petitioner] pulled a knife, but the victim fought back and was able to get away.
>
> On July 2, 2011, while riding his bicycle, the victim saw [Petitioner]'s truck at the house of a mutual friend. The victim then approached [Petitioner], again asking for the return of his tools and asking that [Petitioner] refund money to a customer for whom [Petitioner] had failed to perform work. According to the victim, as he walked by the truck, [Petitioner] "pulls out this ax, and he's coming at me." After a scuffle, [Petitioner] told the victim "he's going to kill me, and all this stuff, you know, and he cussed me and called me names. So I was just trying ... I got on my bike and rode away." [Petitioner] then apparently told the mutual friend "I'm going to run him over" and then left.
>
> A short time later, while riding his bicycle near an alley, the victim saw [Petitioner] approaching in "a Ford Ranger, extended cab" truck. At trial, the victim testified:
>
> > I looked up and I seen him, and the last thing in my head is, he smiled. So next thing I know, he revved up his motor and he shot towards me. And I remember what happened. He hit the back of my bike, he had spun me all the way around about ten feet in the dirt. I landed on the dirt.
>
> Still able to ride, the victim got back on his bicycle, "trying to get away." The victim thought he had lost [Petitioner], but "all of a sudden I hear his motor revving up, and I look back and he's no more than maybe a foot from my bumper [of the bike], and he's laughing; so I realize what's going on." The victim again tried to get away, including riding toward a field, but "at the same time [[Petitioner]] turns his wheel and hit[s] my bike; and that's the last thing I remember, and I wake up in the hospital."
>
> According to a witness, [Petitioner] "parked in this field, like he was waiting for [the victim], in his truck, with it running." The witness testified [Petitioner] ran the victim "down on his bicycle. [The victim] went up underneath the truck.... The bike collapsed, and [the victim] was drug underneath the truck." After running over the victim, [Petitioner] sped off. The victim sustained multiple injuries, including a concussion and head injuries resulting in 13 stitches, including across his eye; a broken ankle and

his "funny bone was ripped out" from his elbow. The mutual friend testified that, after the incident, [Petitioner] returned and parked his truck at the friend's house, tossed the keys to the friend and said "that he had did it. That he done it."

*State v. Dickinson*, 233 Ariz. 527, 528-29, ¶¶ 2-5 (App. 2013).

The Arizona Court of Appeals provided the following procedural history:

The indictment charged [Petitioner] with attempted second degree murder, a class 2 dangerous felony, and other felony offenses. The State's theory of the case was that [Petitioner] tried to kill the victim. [Petitioner] did not testify and called no witnesses but asserted a defense of mistaken identity and claimed he had no involvement. [Petitioner] argued someone else ran over the victim and that he was being framed in an attempted insurance or prescription drug fraud. At no time did [Petitioner] assert that he hit the victim with his truck but did not intend to or try to kill the victim.

In its opening statement, the State repeatedly maintained that the evidence would show [Petitioner] "tried to kill [the victim]." In closing argument, the State repeatedly argued that [Petitioner] "was trying to kill [the victim]." Focusing on a comment [Petitioner] made in a recorded jail call that "I was defending myself really," the State argued [Petitioner]'s acts were "not self-defense" and asked the jury to "[r]emember [[Petitioner]] said he was going to ... kill him." After referencing the attempted murder jury instruction quoted in the following paragraph, the State told the jury that the victim was lucky, the victim's injuries could have been much worse and [Petitioner] was "trying to kill" the victim.

Without objection, the court gave the following attempted second degree murder jury instruction (the italicized portion of which is at issue here):

The crime of attempted second degree murder has three elements. In order to find the defendant guilty of attempted second degree murder, you must find that, number one, the defendant intentionally did some act; and number two, the defendant believed such act was a step in the course of conduct planned to culminate in the commission of the crime of second degree murder; and number three, the defendant did so with the mental state required for the commission of the crime of second degree murder.

It is not necessary that you find that the defendant committed the crime of second degree murder; only that he attempted to commit such crime.

> The crime of second degree murder has the following elements: Number one, the defendant caused the death of another person; and number two, the defendant either, A, did so intentionally or, B, knew that his conduct would cause death *or serious physical injury.*
>
> After a three-day trial, the jury found [Petitioner] guilty as charged. Finding [Petitioner] had one prior historical felony conviction, the court sentenced him to an aggravated term of 12 years in prison on the attempted second degree murder conviction and to prison terms on the other counts.

*Id.* at 529-30, ¶¶ 6-8.

As the R & R recounts, following trial, Petitioner appealed his conviction for attempted second degree murder and the resulting sentence. (Doc. 22 at 5.) On direct appeal, Petitioner challenged the portion of the attempted second degree murder jury instruction stating that a jury could return a guilty verdict on a showing that he knew that his conduct would cause serious physical injury but not death. *Dickinson*, 233 Ariz. at 530, ¶ 10. Because Petitioner did not object to the jury instruction at trial, however, the Arizona Court of Appeals' review was limited to fundamental error. *Id.* On direct review, Petitioner therefore bore the burden of establishing that "(1) error exists, (2) the error is fundamental, and (3) the error caused him prejudice." *Id.* (*citing State v. James*, 231 Ariz. 490, 493, ¶ 11 (App. 2013) (citations omitted in original)). To prove prejudice, Petitioner had to show that "a reasonable, properly instructed jury 'could have reached a different result.'" *Id.* at 531, ¶ 13 (*citing James*, 231 Ariz. at 494, ¶ 15).

The Arizona Court of Appeals found that the trial court erred in instructing the jury that it could convict Petitioner of attempted murder on a finding that Petitioner knew his conduct would cause serious physical injury. *Dickinson*, 233 Ariz. at 530, ¶ 11. The Court of Appeals further found that this error was fundamental because the instruction potentially improperly relieved the State of its burden of proving an element of the offense. *Id.* at 531, ¶ 12. After reviewing the particular facts of this case, however—including the State's theory of the case that Petitioner intended to kill the victim, Petitioner's mistaken identity defense, and the evidence and arguments presented—the Arizona Court of Appeals found

that Petitioner failed to prove resulting prejudice from the fundamental error in the jury instruction. *Id*. at 533, ¶ 22. Accordingly, the Arizona Court of Appeals affirmed Petitioner's conviction and sentence for attempted second degree murder. *Id*., ¶ 23.

The Arizona Supreme Court denied cross-petitions for review, and neither party petitioned the United States Supreme Court for certiorari. (Doc. 22 at 6.) On June 12, 2014, Petitioner timely initiated post-conviction relief ("PCR") proceedings, and PCR counsel was appointed to assist him. (*Id*.); (*see also* Doc. 6-5 at 13.) In Petitioner's initial PCR Petition, PCR counsel raised two claims of ineffective assistance of trial counsel, neither of which was related to the incorrect jury instruction. (Doc. 22 at 6.) PCR counsel similarly did not raise a due process claim related to the incorrect jury instruction. (*Id*.) The trial court denied Petitioner's initial PCR Petition, concluding that the claims raised were not colorable. (Doc. 6-5 at 22, 23.)

On August 26, 2015, Petitioner, in his *pro se* capacity, filed a second notice of PCR, alleging that PCR counsel was ineffective for "failing to raise any meritorious claims." (Doc. 6-5 at 29-30.) Petitioner did not identify the purportedly meritorious claims. The trial court denied relief, finding that Petitioner, as a non-pleading defendant, was not entitled to effective assistance of PCR counsel under Arizona law. (Doc. 22 at 6); (Doc. 6-5 at 35.)

Petitioner filed two Petitions for Review in the Arizona Court of Appeals (one for each PCR Petition). (Doc. 22 at 6.) The Court of Appeals granted review of both petitions but denied relief. (*Id*.) Petitioner then timely filed the instant habeas petition in this Court. (*Id*.); (Doc. 6 at 7-9.)

## II. Legal Standard

When a federal district court reviews a state prisoner's habeas corpus petition pursuant to 28 U.S.C. § 2254, "it must decide whether the petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Coleman v. Thompson*, 501 U.S. 722, 730 (1991) (*quoting* 28 U.S.C. § 2254). When reviewing a Magistrate Judge's R & R, this Court reviews *de novo* those portions of the report to which

an objection is made and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). District courts are not required to conduct "any review at all . . . of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985).

## III.    Analysis

The Petition raises two grounds for relief.[3]  Petitioner alleges (1) that his due process rights were violated by the incorrect jury instruction; and (2) that he received ineffective assistance of trial counsel because his trial counsel failed to object to the erroneous jury instruction. (Doc. 1 at 5-6.) The R & R correctly finds (and the parties do not dispute) that both of Petitioner's claims are procedurally defaulted because Petitioner never presented them in state court, and no state remedies remain available to him. (Doc. 22 at 7.) The R & R concludes, however, that *Martinez v. Ryan*, 566 U.S. 1 (2012), excuses the procedural default on Ground II because Petitioner's PCR counsel was ineffective under the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and because the underlying ineffective assistance of trial counsel claim has some merit. (Doc. 22 at 8-9.) Reaching the merits of Petitioner's procedurally defaulted ineffective assistance of trial counsel claim, the R & R finds that Petitioner's trial counsel rendered ineffective assistance of counsel and recommends that the Petition be granted as to Ground II. (Id. at 15.)

The R & R recommends that Ground I be denied because it is procedurally defaulted without excuse. (Id. at 15.) Because Petitioner did not file an objection, the Court will accept and adopt the portion of the R & R recommending that the Petition be **denied** as to Ground I.

### A.    *Martinez v. Ryan*

A federal habeas court reviewing the constitutionality of a state prisoner's conviction and sentence is "guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." *Martinez*, 566 U.S. at 9. The doctrine of procedural

---

[3] Petitioner seeks relief solely from his attempted second degree murder conviction. (Doc. 1 at 5-6.)

default, which prevents a federal court from reviewing the merits of a claim that the state court declined to hear because a prisoner failed to abide by a state procedural rule, is one of those rules. *Id*. at 9-10. A prisoner may obtain federal review of a procedurally defaulted claim, however, by showing cause for the default and prejudice from a violation of federal law. *Id*. at 10 (*citing Coleman*, 501 U.S. at 750).

Where a state, like Arizona, requires a prisoner to raise an ineffective assistance of trial counsel claim in a collateral proceeding, the prisoner may establish cause for default by demonstrating that his counsel in the initial collateral proceeding was ineffective under *Strickland* for failing to raise the ineffective assistance of trial counsel claim. *Martinez*, 566 U.S. at 14. The prisoner must also demonstrate that the underlying ineffective assistance of trial counsel claim is "a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."[4] *Id.*

### B. Deficient performance of trial counsel under *Strickland*

The jury instruction given at Petitioner's trial was erroneous because attempted second degree murder can only be committed if the defendant intended to kill the victim or knew that the conduct would cause death. *Dickinson*, 233 Ariz. at 530, ¶ 11. The R & R concludes that because Petitioner's trial counsel failed to object to the erroneous jury instruction, trial counsel's performance "fell below an objective standard of reasonableness" that constitutes deficient performance under the first prong *Strickland*. (Doc. 22 at 11) (*quoting Strickland*, 466 U.S. at 688.) Respondents make two objections to this finding. First, Respondents claim that the R & R impermissibly requires the State to "provide an explanation from trial counsel for their strategic choices before the deferential inquiry [under *Strickland*] can occur . . . ." (Doc. 25 at 2.) Second, Respondents argue that the R & R improperly limits *Strickland*'s deferential review to

---

[4] The Court notes that *Ramirez v. Ryan*, 937 F.3d 1230 (9th Cir. 2019) was decided after the parties' briefs were filed in this case. The Court finds *Ramirez* inapposite, however, because the parties' arguments in this case do not depend on facts outside of the record and neither party requested evidentiary development. (*See* Doc. 22 at 15); *Ramirez*, 937 F.3d at 1248. Because the underlying ineffective assistance of trial counsel claim does not depend on evidence outside the trial record, the Court does not deem factual development necessary to decide cause and prejudice under *Martinez*.

"strategic decisions made after 'thorough investigation of law and facts relevant to plausible options.'" (Doc. 25 at 1) (*quoting* R & R's citation to *Strickland*). The Court overrules both of Respondents' objections and adopts the R & R's conclusion that Petitioner's trial counsel rendered deficient performance.

"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (internal citations and quotations omitted). A court deciding a Sixth Amendment ineffectiveness claim must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. A defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Id*. The Court must then determine, in light of all the circumstances, whether the acts or omissions were outside "the wide range of professionally competent assistance." *Id*. In making that determination, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*.

Here, the Court agrees with Respondents that deferential review of trial counsel's performance under *Strickland* is not triggered by the State's provision of an explanation from trial counsel, justifying his or her choices. *See Burt v. Titlow*, 571 U.S. 12, 22-23 (2013) ("absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance") (*quoting Strickland*, 466 U.S. at 689). Nor is deferential review under *Strickland* required solely if the record reflects that trial counsel engaged in a "thorough investigation of law and facts relevant to plausible options." *Cf.* (Doc. 22 at 10); *Strickland*, 466 U.S. at 691 ("[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). The Court nonetheless agrees with the R & R's conclusion that

trial counsel's failure to object to the erroneous jury instruction in this case cannot be considered the result of reasonable professional judgment. At the time of Petitioner's trial, the law in Arizona was very clear that attempted second degree murder can only be committed if the defendant intended to kill the victim or knew that the conduct would cause death. *Dickinson*, 233 Ariz. at 530, ¶ 11 (App. 2013) (*citing State v. Ontiveros*, 206 Ariz. 539, 542, ¶ 14 (App. 2003)). Therefore, by failing to object to the erroneous jury instruction, trial counsel's performance fell below an objective standard of reasonableness. *See Harris v. Warden, Louisiana State Penitentiary*, 152 F.3d 430, 440 (5th Cir. 1998) (failure to object to erroneous jury instruction for attempted murder constituted deficient performance under first prong of *Strickland*).

Accordingly, the Court rejects the portion of the R & R which states that deference to trial counsel is only owed to strategic decisions made after "thorough investigation of law and facts relevant to plausible options." (Doc. 22 at 10.) The Court also rejects any inference that the State must provide an explanation from trial counsel before deferential review under *Strickland* is required. (*Id*.) The Court adopts the R & R's conclusion, and remaining reasoning in support thereof, that trial counsel's performance was deficient under the first prong of *Strickland*. (*Id*. at 9-11.)

## C. Prejudice under *Strickland*

The R & R concludes that Petitioner demonstrated prejudice from his trial counsel's deficient performance under *Strickland* because the "jury instructions included a correct and an incorrect statement of law" and "there is no ability to discern whether the jury relied on 'a legally inadequate theory' of the case to convict [Petitioner]." (Doc. 22 at 13) (*quoting Griffin v. United States*, 502 U.S. 46, 59 (1991)). Respondents object to this conclusion, asserting that the R & R improperly evaluates prejudice by considering whether the outcome of trial *could* have been different with a proper jury instruction, instead of assessing whether the outcome *would* have been different. (Doc. 25 at 3.) Respondents additionally argue that the R & R improperly applied the harmless error test from *Brecht v. Abrahamson*, 507 U.S. 619 (1993), (Doc. 25 at 3), and that the R & R incorrectly

"focuses on the loss of a more favorable standard of review on appeal rather than the impact of counsel's decisions at trial." (Doc. 25 at 4.) The Court agrees with Respondents and therefore rejects the R & R's conclusion that Petitioner demonstrated prejudice under *Strickland* solely from his trial counsel's failure to object to the erroneous jury instruction.

### 1. "Could" versus "Would"

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceedings if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Accordingly, under *Strickland*, the defendant must demonstrate that any deficiencies in counsel's performance were prejudicial to the defense. *Id*. at 692. It is not enough for the defendant to show "that the errors had some conceivable effect on the outcome of the proceeding" because "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id*. at 693. To demonstrate prejudice under *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

The Court finds that the R & R correctly states the standard for determining prejudice under *Strickland*. (Doc. 22 at 11) ("[Petitioner] must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *would* have been different.'") (emphasis added); (*see also* Doc. 22 at 12) ("Considering the facts presented at trial . . . .") However, the Court agrees with Respondents that the R & R strays from this standard by finding that Petitioner proved prejudice under *Strickland* simply because there is no ability for the court to discern under which legal theory the jury voted to convict Petitioner. (Doc. 22 at 4, 13) ("The jury form did not give the jury an opportunity to explain the basis for finding [Petitioner] guilty . . . . Thus, there is no ability to discern whether the jury relied on 'a legally inadequate theory'. . . .") (*quoting Griffin*, 502 U.S. at 59).

To find prejudice under *Strickland*, Petitioner and the R & R rely heavily on *Gray*

*v. Lynn*, 6 F.3d 265, 269-70 (5th Cir. 1993), which states that in evaluating whether the outcome of trial would have been different, "[t]he question is whether, from all the evidence, the jury *could* have had a reasonable doubt concerning [Gray's] intent to kill, and could have convicted him of intent to cause [great] bodily [harm]." (Doc. 31 at 2-3) (emphasis supplied by Petitioner); (Doc. 22 at 11-12.) According to Petitioner (Doc. 31 at 2), *Gray* justifies the R & R's inquiry into whether the jury, in fact, convicted Petitioner of intent to cause bodily harm instead of intent to kill.

In *Gray* the defendant appeared at the victim's door with a gun, threatened to "blow [the victim's] brains out," struck the victim twice on the head with the gun, and later fired three shots at the victim at close range (none of which actually struck the victim). 6 F.3d at 270. The jury in *Gray* was erroneously instructed that an essential element of the offense of attempted first degree murder is "specific criminal intent to kill *or* inflict great bodily harm." *Id*. at 269 (emphasis added). Instead of limiting its inquiry under *Strickland* to whether "there [was] a reasonable probability that the jury would have had a reasonable doubt respecting Gray's guilt" if the jury had been properly instructed, the court in *Gray* proceeded to evaluate whether, "[u]nder the court's instructions" it was possible that the jury *could* have convicted Gray under the incorrect legal theory. 6 F.3d at 269, 271 ("*Under the court's instructions*, the jury *could have convicted* Gray for attempted first degree murder on the basis of a finding that he had the intent to inflict great bodily harm, even if it had reasonable doubt that he had the specific intent to kill [the victim]. Therefore, Gray has demonstrated prejudice 'sufficient to undermine confidence in the outcome' of his trial. No more is required.") (emphasis added).

For numerous reasons, the Court finds that *Gray* is of limited value here. First, *Gray*'s prejudice analysis is inconsistent with *Strickland*. While the Fifth Circuit in *Gray* indicated that it analyzed *Strickland*'s prejudice prong by "considering the evidence and the instructions as a whole," 6 F.3d at 271, the court's ultimate conclusion rested on the premise that prejudice exists under *Strickland* where it is impossible to "conclude that the jurors ignored the court's erroneous instructions." *Id*. Because the Supreme Court has on

numerous occasions declined to include erroneous jury instructions like the one in this case among the list of constitutional violations requiring *automatic* reversal on direct appeal, *see Neder v. United States*, 527 U.S. 1, 9-10 (1999) (collecting cases), the Court declines to presume prejudice under *Strickland* where the court cannot ascertain (via a special verdict form or otherwise) the actual legal theory under which each juror voted to convict. *Cf. Gray*, 6 F.3d at 271 ("we cannot conclude that the jurors ignored the court's erroneous instructions . . .").

Second, the Court notes that in *Gray*, the defendant filed his federal habeas application in 1987. Therefore, the deference owed to the state court's determination of factual issues in the instant case, pursuant to § 2254(e)(1), was not an element of the analysis in *Gray*. *See Lindh v. Murphy*, 521 U.S. 320 (1997) (holding that the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") do not apply to cases that were filed before the April 1996 effective date of that act). In any event, in *Gray* the sole issue addressed by the Louisiana Supreme Court on direct appeal was whether the defendant was denied the right to speedy trial. *See Gray*, 6 F.3d at 267 n.7. In contrast here, there is a reasoned opinion from the Arizona Court of Appeals that contains factual findings about the State's theory of the case and the evidence presented during Petitioner's trial.

Third, the Court notes that five years after *Gray*, in *Harris*, 152 F.3d at 434, the Fifth Circuit affirmed the district court's denial of habeas relief where the defendant alleged ineffective assistance of counsel stemming from an erroneous jury instruction. And in *Harris*, the Fifth Circuit declined to presume prejudice under *Strickland* where the court could not ascertain the theory under which the jury convicted, instead finding—based on a review of the evidence and arguments presented at trial—that the outcome of the proceeding would not have been different with a properly instructed jury. *See Harris*, 152 F.3d at 440 n.11.

In sum, the Court agrees with Respondents that the R & R's finding of prejudice under *Strickland* incorrectly focuses on the potential that one juror *could* have convicted

Petitioner based on a showing that he knew his conduct would cause serious physical injury but not death. For this reason, and the additional reasons stated below, the Court rejects the R & R's finding of prejudice under *Strickland*.

### 2. Harmless error under *Brecht* and structural error under *Weaver*

Respondents object (Doc. 25 at 3) to the R & R, claiming that it improperly applies the *Brecht* standard, 507 U.S. 619, which requires a lower showing of harm than *Strickland*. Petitioner responds that the cases relying on *Brecht* are cited in the R & R with a "*cf.*" citation because they all involved "legally untenable jury instructions," and not because the R & R was presuming prejudice from the erroneous instruction. (Doc. 31 at 3.) Alternatively, Petitioner argues, *citing Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017), that because the erroneous legal theory was structural error, Petitioner should be relieved of his burden to satisfy the traditional prejudice test under *Strickland*. (Doc. 31 at 3-4.) The Court agrees with Respondents that the R & R improperly focuses on cases addressing erroneous jury instructions outside of the context of ineffective assistance of counsel. Additionally, for reasons stated below, the Court declines to apply *Weaver* to this case.

In *Brecht v. Abrahamson*, the Supreme Court considered whether the *Chapman*[5] harmless error standard (which places the burden on the State to prove on direct review that the constitutional error was harmless beyond a reasonable doubt where the issue was properly preserved and raised) should apply on federal habeas review. *Brecht*, 507 U.S. at 636. Noting that collateral review is different from direct review—and considering the States' interests in finality and sovereignty over criminal matters—the Supreme Court held in *Brecht* that error requires habeas relief only if the petitioner establishes that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 623 (*quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "[G]ranting habeas relief merely because there is a 'reasonable possibility' that the error contributed to the verdict . . . is at odds with the historic meaning of habeas corpus—to afford relief to those

---

[5] In *Chapman v. California*, 386 U.S. 18, 22, 26 (1967), the Supreme Court established the general rule that a constitutional error does not automatically require reversal of a conviction.

- 13 -

whom society has 'grievously wronged.'" 507 U.S. at 637. Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under *Strickland*, this Court "appl[ies] *Strickland*'s prejudice standard and do[es] not engage in a separate analysis applying the *Brecht* standard." *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).

While some errors—known as "structural errors"—require reversal on direct review regardless of whether an objection was made below and regardless of the mistake's effect on the proceeding, *see Neder*, 527 U.S. at 8; *Weaver*, 137 S. Ct. at 1907 (*citing Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991)), because the Petition raises an ineffective assistance of counsel claim, the Court must review the erroneous jury instruction through the lens of *Strickland*. (Doc. 1 at 6.) Whether an erroneous jury instruction constitutes structural error that requires automatic reversal on direct review—or whether habeas relief should be granted on a non-defaulted due process claim under *Brecht*—are separate questions from whether a defendant can show, based on the evidence and arguments presented during trial, that the outcome of trial *would* have been different with a properly instructed jury. Because *Strickland* requires the latter, the Court agrees with Respondents that the R & R improperly relies on cases that addressed erroneous jury instructions outside of the ineffective assistance of counsel context. (Doc. 22 at 12) (*citing Martinez v. Garcia*, 379 F.3d 1034, 1035 (9th Cir. 2004) (state court's decision was contrary to clearly established federal law because it failed to discuss on direct review the structural error resulting from from erroneous jury instructions)); (Doc. 22 at 12) (*citing Evanchyk v. Stewart*, 340 F.3d 933, 940-41 n.2 (9th Cir. 2003) (noting cases where the Supreme Court found structural error for erroneous jury instructions on direct review)); (Doc. 22 at 13) (*citing Suniga v. Bunnel*, 998 F.2d 664, 669 (9th Cir. 1993), *overruled on other grounds by Evanchyk*, 340 F.3d 933) (reversing district court's denial of habeas corpus because state court's evaluation of structural error on direct review was unreasonable); (Doc. 22 at 13) (*citing Sheppard v. Rees*, 909 F.2d 1234 (9th Cir. 1989) (reversing district court's denial of habeas corpus and finding that the failure to give the defendant adequate notice of the charges against him—where the error was raised during trial and on direct appeal—was

not subject to harmless-error determination)); (Doc. 22 at 13) (*quoting Riley v. McDaniel*, 786 F.3d 719, 726 n.1 (9th Cir. 2015) (evaluating whether instructional error was harmless under *Brecht* and expressly declining to reach the ineffective assistance of counsel claim)).

Petitioner alternatively argues, citing *Weaver*, that it is "far from clear" he needs to satisfy the traditional prejudice test. (Doc. 31 at 3.) In *Weaver*, which reached the Supreme Court on direct review, the Court addressed what showing was necessary where the defendant did not preserve a structural error on direct review but later raised it for the first time in the context of ineffective assistance of counsel. *Weaver*, 137 S. Ct. at 1910. The structural error in *Weaver* (to which the defendant's trial counsel failed to object) was closure of the courtroom during jury selection, and the Supreme Court expressly noted that it granted certiorari "specifically and only in the context of trial counsel's failure to object to the closure of the courtroom during jury selection." *Id*. at 1906, 1907. While recognizing that structural errors may require automatic reversal where an error was preserved and raised on direct review, the Supreme Court held that when a structural error is raised for the first time in the context of an ineffective assistance of counsel claim, finality concerns require the defendant to show prejudice under *Strickland* in order to obtain a new trial. *Id*. at 1913. "[W]hen a defendant raises a public-trial violation via an infective-assistance-of-counsel claim, *Strickland* prejudice is not shown automatically. Instead, the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or, as the Court has assumed *for these purposes* . . . to show that *the particular public-trial violation* was so serious as to render his or her trial fundamentally unfair." *Id*. at 1911 (emphasis added).

Because the Supreme Court in *Weaver* expressly limited its holding to structural errors stemming from a public-trial violation, the Court will not evaluate whether the erroneous jury instruction in this case was so serious as to render Petitioner's trial fundamentally unfair. Petitioner must demonstrate that the outcome of his trial would have been different with a properly instructed jury.

### 3. Loss of a more favorable standard on appeal

Respondents also object to the R & R (Doc. 25 at 4), stating that it improperly "focuses on the loss of a more favorable standard of review on appeal rather than the impact of counsel's decisions at trial." Petitioner responds (Doc. 31 at 4) that numerous courts in this district, other circuits, as well as the Ninth Circuit in an unpublished opinion, have held that the deprivation of an issue on appeal demonstrates prejudice under *Strickland*.

The R & R posits that, had Petitioner's trial counsel objected to the erroneous jury instruction, the court of appeals would have reviewed it for harmless error, placing the burden on State to show that the error was harmless beyond a reasonable doubt. (Doc. 22 at 14-15.) Because Petitioner's trial counsel did not object, however, the Arizona Court of Appeals reviewed the instruction for fundamental error, which placed the burden on Petitioner. (*Id.*) While some courts have adopted the view that an inquiry into trial counsel's effectiveness under *Strickland* includes an evaluation of whether the appeal would have been different, but for trial counsel's missteps—*see May v. Ryan*, 245 F. Supp. 3d 1145, 1168-69 (D. Ariz. 2017) (*vacated in part by May v. Ryan*, 766 Fed.App'x. 505 (9th Cir. 2019)); *Burdge v. Belleque*, 290 Fed. App'x 73, 79 (9th Cir. 2008); *French v. Warden, Wilcox State Prison*, 790 F.3d 1259, 1269 (11th Cir. 2015)—Arizona courts have not. *See State v. Speers*, 238 Ariz. 423, 431, ¶ 31 (App. 2015) (*quoting Strickland*, 466 U.S. at 696) ("ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged"); *see also Kennedy v. Kena*, 666 F.3d 472, 485-86 (11th Cir. 2012) (finding *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), which focused on loss of appeal in its entirety, does not require courts to evaluate under *Strickland* whether counsel's failure to preserve issues at trial affected the direct appeal); *Bonney v. Wilson*, 754 F.3d 872, 885 (10th Cir. 2014) (*Flores-Ortega* does not require courts to evaluate trial counsel's performance under *Strickland* by considering whether outcome of appeal would have been different).

Without more, the Court declines to stray from *Strickland*'s pronouncement that the prejudice inquiry should focus on the fairness of the proceeding whose result is being

challenged. *Strickland*, 466 U.S. at 696. Had PCR counsel raised the ineffective assistance of trial counsel claim, the PCR court would have focused on whether the outcome of trial would have been different, not whether the appeal would have been different. The Court therefore rejects the portion of the R & R that addresses the loss of a more favorable standard of review on appeal.[6]

### 4. Petitioner did not meet his burden under *Strickland*.

The Court finds that, under the standard set forth in *Strickland*, Petitioner did not show that the outcome of his trial would have been different with a properly instructed jury. The Court presumes that the Arizona Court of Appeals' factual findings are correct, and Petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).

The Court rejects certain factual findings contained in the R & R. First, the R & R notes that after Petitioner hit the victim's bike the first time, Petitioner "found C.H. again . . . ." (Doc. 22 at 2.) The Arizona Court of Appeals, however, stated that, according to an eyewitness, after Petitioner hit C.H. on his bike the first time, Petitioner then parked his truck in a field, and left the motor running, like he was lying in wait for the victim. *Dickinson*, 233 Ariz. at 529, ¶ 5; *see also* (Doc. 6-2 at 131) (eyewitness testifying that Petitioner came "ripping out of the field" and "floored" his truck when he went after C.H. the second time.) Next, the R & R omits that the second time Petitioner hit C.H. with his truck, C.H.'s body was drug "up underneath the truck." *Dickinson*, 233 Ariz. at 529, ¶ 5; *see also* (Doc 6-2 at 132-33) (testifying that C.H.'s bike folded up under the truck, that C.H. was drug underneath the truck, and that his body went beneath the whole front suspension of the four-wheel drive and was ejected out the passenger side on the ground underneath Petitioner's truck). Additionally, the R & R minimizes the extent of C.H.'s injuries, stating that "C.H. was knocked unconscious and woke up in the hospital with a broken ankle, his elbow was bleeding, he had a concussion, and 13 stitches over his eye."

---

[6] The Court is not convinced in any event that Petitioner would have prevailed on direct appeal under harmless error review, given the Court of Appeals' characterization of the record.

(Doc. 22 at 3.)   As the Court of Appeals noted, however, C.H.'s elbow was not just "bleeding"—his funny bone was ripped out of his elbow.  *Dickinson*, 233 Ariz. at 529, ¶ 5; (*see also* Doc. 6-2 at 63-64) (C.H. additionally testifying that he had to have surgery on his big toe and that his bicep and triceps were ripped from his muscle.)

Further, the R & R states that when Petitioner made the statement that he wanted to kill the victim, the statement was made jokingly. (Doc. 22 at 12.)  The record reflects, however, that Petitioner only "jokingly" told the mutual friend that he wanted to "run [C.H.] over." (Doc. 22 at 2); (Doc. 6-2 at 110.)  There was no testimony that Petitioner was joking when he raised an ax and told C.H. that he was going to kill him.  *Cf.* (Doc. 22 at 12); (Doc. 6-5 at 56.)   Further, while the R & R correctly notes (Doc. 22 at 2) that the mutual friend testified Petitioner's statement about wanting to run over C.H. was made "jokingly," (Doc. 6-2 at 110), the R & R omits that after the incident, Petitioner "returned and parked his truck at the friend's house, tossed the keys to the friend and said 'that he had did it. That he done it.'" *Dickinson*, 233 Ariz. at 529, ¶ 5; (Doc. 6-2 at 98.)

The Court also disagrees with the R & R's finding that "the prosecutor argued in closing to the jury that the state did not have the burden to prove [Petitioner] intended to kill C.H. but that intent of serious physical injury was enough." (Doc. 22 at 13.)  While the prosecutor certainly reiterated the erroneous jury instruction to the jury during closing statements, the crux of prosecutor's argument was that Petitioner was trying to kill C.H.:

> Now the attempted second degree murder.  That requires you—that the defendant did some act intentionally.  He ran the victim over.  And that he believed such a step was in the course of committing second degree murder.  And of course, the judge instructed you, you don't have to—[C.H.] doesn't have to be dead.  This is attempted murder.
>
> The step in the course of committing second degree murder is going to run somebody over on their bike, with your vehicle; and when you look at the instruction, it's either he did this intentionally or that he knew that his conduct would result in death or serious physical injury.
>
> Now, [C.H.]'s lucky.  This could have been much worse; his injuries could have been much worse.  You get spit through underneath a truck, could have been much worse.  *But he was trying to kill him.*

(Doc. 6-3 at 156) (emphasis added).

- 18 -

The R & R also cites Doc. 6-3 at 189:25-190:4 to show that the prosecutor argued in closing to the jury that the State did not have the burden to prove that Petitioner intended to kill C.H in order to convict him of second degree murder. (Doc. 22 at 13.) But the prosecutor at that portion of the record stated solely that the State did not have to prove how fast Petitioner was driving when he ran over C.H. (*See* Doc. 6-3 at 189) ("Now, he said there's no testimony as far as speed. Do you have to—you guys, your common experience and life experience, you know, that people get killed when they get [run] over. Backing out, someone gets backed over, people get killed at low speeds. And there was there was no testimony that defendant was going 35 miles an hour. There was no number. There was a lot of testimony about acceleration marks and about the defendant running over [C.H.]. I mean we don't have to prove that. The burden—look at the injury instruction. We don't have to prove that it was at a certain speed, one, that he was injured, one, that defendant did it, and that he did with his car and he broke his foot.")[7]

Most importantly, the Arizona Court of Appeals found, as a factual matter, that the State's theory at trial was that Petitioner intended to kill C.H., not that he intended to cause serious physical injury or knew that his conduct would cause serious physical injury. *Dickinson*, 233 Ariz. at 531, ¶¶ 13-14. The Court of Appeals further found that because Petitioner's defense was mistaken identity, which did not implicate the erroneous portion of the jury instruction, Petitioner's argument that the erroneous jury instruction prejudiced him was undercut. *Id.*, ¶ 15.

Because the Arizona Court of Appeals considered the evidence and found that Petitioner failed to prove that a "reasonable, properly instructed jury '*could* have reached a different result,'" *Dickson*, 233 Ariz. at 531, ¶ 13 (*quoting James*, 231 Ariz. at 494, ¶ 15) (emphasis added), the Court cannot say under *Strickland* that the outcome of trial *would*

---

[7] Petitioner was also charged with two counts of aggravated assault, which required the State to prove either that Petitioner intentionally, knowingly, or recklessly caused a physical injury to another person, and that he did so using a dangerous instrument (Doc. 6-3 at 143), or that Petitioner intentionally, knowingly, or recklessly caused a physical injury to another by means of force that caused the fracture of any body part (*Id.* at 144). It is more likely that the prosecutor's reference to the "injury instruction" (*Id.* at 189:25-190:4) at this portion of the record pertained to the aggravated assault counts, not the second degree murder count.

have been different with a properly instructed jury. As the Arizona Court of Appeals correctly noted, Petitioner threated C.H. with an ax and told C.H. that he would kill him just minutes before the incident. *Dickinson*, 233 Ariz. at 531, ¶ 16. When C.H. rode away on his bicycle, Petitioner said that he was going to run him over, and then drove after him. *Id.* C.H. testified that just before being run over, Petitioner "had that look in his face like, you know, he was going to kill me, man, he was going to kill me." *Id.* And an eyewitness testified that Petitioner drove over C.H.'s body so that C.H.'s body was drug up underneath it. *Id.* The R & R does not properly defer to the Arizona Court of Appeals finding that the "evidence [was] consistent with the State's theory that [Petitioner] intended to kill the victim, not just cause serious physical injury." *Id.*; *cf.* (Doc. 22 at 12) (R & R finding that very little of the evidence indicated that Petitioner intended or knew that his conduct would cause death).

In sum, Petitioner did not show that the outcome of trial would have been different without the erroneous jury instruction. Accordingly, Petitioner has not shown that his trial counsel rendered constitutionally defective assistance of counsel. Because the underlying ineffective assistance of trial counsel claim lacks merit, Petitioner's PCR counsel was not ineffective for failing to raise it. Therefore, under *Martinez* Petitioner has neither demonstrated cause for the default nor prejudice sufficient to excuse his procedurally defaulted claim.[8] The Court will **deny** the Petition (Doc. 1.)

///

///

///

///

///

_____

[8] The Court has ultimately found that the underlying ineffective assistance of trial counsel claim is not substantial under *Martinez* because the ineffective assistance of trial counsel claim is without merit. *See Sexton v. Cozner*, 679 F.3d 1150, 1159-60 (9th Cir. 2012). However, even if this Court had found that the underlying ineffective assistance of trial counsel claim was substantial under *Martinez*, the result herein would be the same because *Ramirez* does not require evidentiary development in this instance, *see supra* n.4, and because the Court ultimately reached the merits of the underlying ineffective assistance of trial counsel claim, finding it meritless under *Strickland*.

**IV.    Conclusion**

In light of the foregoing,

**IT IS ORDERED** that the R & R (Doc. 22) is accepted in part and rejected in part. The objections are overruled to the extent indicated above.  Upon this Court's *de novo* review of Ground II, the Court finds that Petitioner did not show cause for the default or prejudice sufficient to excuse his procedurally defaulted ineffective assistance of trial counsel claim. Accordingly, the Petition for Habeas Corpus (Doc. 1) is **denied** with prejudice, and the Clerk of the Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that in the event Petitioner files an appeal, the Court **grants** in part the certificate of appealability (part of Doc. 31).  Petitioner requested in the alternative that the Court grant a certificate of appealability (part of Doc. 31), and R & R recommended that one be granted if the Court did not accept the R & R's recommendation to grant relief on Ground II (Doc. 22 at 15-16.)  Pursuant to 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To meet the threshold inquiry on debatability, the petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; *or* that the questions are adequate to deserve encouragement to proceed further." *Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000) (alteration and emphasis in original).  A constitutional claim is debatable if another circuit has issued a conflicting ruling.  *See id.* at 1025-26.  As to Ground II, the Court finds that the following questions are adequate to deserve encouragement to proceed further: 1) whether an inquiry into trial counsel's effectiveness under *Strickland* includes an evaluation of whether the direct appeal would have been different, but for trial counsel's missteps; 2) whether, under *Weaver*, Petitioner should be relieved of his burden to demonstrate that the outcome of trial would have been different; and 3) whether *Strickland* in this context allows prejudice to be

found solely because the court cannot know the legal theory under which the jury convicted the defendant. *Cf. Gray*, 6 F.3d at 271. The Court denies the certificate of appealability as to the remainder of Ground II and all other grounds.

Dated this 6th day of February, 2020.

Michael T. Liburdi
United States District Judge